**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

      v.

TIMOTHY DALY,

      Defendant.

Civil Action No. 05-055 (CKK)

**MEMORANDUM OPINION**
(August 25, 2008)

The Securities and Exchange Commission ("SEC") brought this action charging

Defendant Timothy Daly ("Daly") with signing false audit statements as part of a scheme to

overstate the income of U.S. Foodservice ("USF"), a subsidiary of Koninklijke Ahold N.V.

("Ahold"). Daly consented to a proposed Final Judgment (the "Consent Judgment") entered by

the Court on August 31, 2006, permanently enjoining him from aiding and abetting violations of

the Securities Exchange Act. The Consent Judgment expressly provided that the amount of

monetary penalties to be assessed to Daly, if any, would be determined through a motion

subsequently filed by the SEC. Currently before the Court is the motion for civil penalties

contemplated by the Consent Judgment, styled as the SEC's Motion for Final Judgment of

Monetary Relief. After a thorough examination of the parties' submissions, including the

attachments thereto, applicable case law, statutory authority and the entire record herein, the

Court shall GRANT the SEC's [14] Motion for Final Judgment of Monetary Relief and impose a

civil penalty of $100,000, for the reasons that follow.

## I.  BACKGROUND

The facts alleged in the SEC's Complaint are deemed true for purposes of the present Motion pursuant to the terms of the Consent Judgment.  *See* [13] Consent Judgment at 5 (Aug. 31, 2006) ("solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court . . . .").  Daly was the Director of Business Development for Michael Foods, a company that sold eggs and other products to USF.  Compl. ¶ 9.  In 2002 and 2003, USF employees convinced vendors such as Daly to sign false audit statements that overstated the amount of promotional allowance payments made to USF.[1]  *Id.* ¶ 13.  To conceal this fraudulent scheme, Daly falsely confirmed overstated promotional allowance amounts to the company's auditors in connection with year-end audits in 2001 and 2002.  Compl. ¶¶ 14-18.  Daly signed these confirmation letters knowing that they contained false information. *Id.*  ¶¶ 14, 16, 19.

The overstated amounts in the letters that Daly signed were significant.  Two of the letters (dated January 23, 2002 and January 29, 2003) overstated the promotional allowances Michael Foods paid USF by more than 100 percent.  *Id.* ¶¶ 15, 18; Pl.'s Mot., Ex. C (1/23/02 Letter from Michael Foods to Auditors), Ex. D (1/29/03 Letter from Michael Foods to Auditors).  Two of the other letters (dated January 29, 2003 and February 3, 2003) "facilitat[ed] double-counting of accounts receivable and income for USF for that period."  Compl. ¶ 16; Pl.'s Mot., Ex. E (1/29/03 Letter from Kohler to Auditors), Ex. F (2/3/03 Letter from Northern Star to Auditors).

In 2003, USF's parent company, Ahold, reported to the SEC that it had overstated its net

---

[1] "Promotional allowances" are amounts that vendors paid to USF during the course of a year.  Compl. ¶ 4.  Since "the majority of USF's operating income" was based on these promotional allowances, an overstatement of these amounts made USF's income appear greater than it actually was.  *Id.*

and operating income, in large measure because USF had overstated its promotional allowances

by at least $700 million for 2001 and 2002.  Compl. ¶¶ 2-4, 6.  When Ahold disclosed that it had

reported materially false net and operating income for those and other periods, its stock price fell

from approximately $10.69 per share to $4.16 per share.  *See* Pl.'s Mot., Ex. 1 ¶ 8 (Decl. of

Matthew B. Greiner).[2]  *Id.* ¶¶ 3-4.

        The SEC brought suit against Daly on January 13, 2005, alleging that his conduct violated

Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Securities Exchange Act of

1934 (the "Exchange Act"), and Exchange Act Rules 10b-5, 12b-20 and 13b2-1.  Daly consented

to a judgment against him, which the Court entered on August 31, 2006.  The Consent Judgment

provided that the SEC's motion for penalties would be governed by the following conditions and

procedures:

> In connection with the [SEC's] motion for civil penalties, and at any hearing held
> on such a motion: (a) Defendant will be precluded from arguing that he did not
> violate the federal securities laws as alleged in the Complaint; (b) Defendant may
> not challenge the validity of the Consent or this Final Judgment; (c) solely for the
> purposes of such motion, the allegations of the Complaint shall be accepted as and
> deemed true by the Court; and (d) the Court may determine the issues raised in the
> motion on the basis of affidavits, declarations, excerpts of sworn deposition or
> investigative testimony, and documentary evidence, without regard to the
> standards for summary judgment contained in Rule 56(c) of the Federal Rules of
> Civil Procedure.

---

[2] The SEC does not provide the aggregate amount of overstatements associated with
Daly's fraudulent conduct, but the amount appears to be a smaller fraction of the $700 million in
overstated allowances made by USF to auditors.  In 2002, Daly signed a letter indicating
$16,765,177 in promotional allowances, and in 2003, he signed a letter indicating $28,200,000 in
promotional allowances.  Compl. ¶¶ 14-15, 17-18.  These amounts overstated the accurate
figures by more than 100 percent.  *Id.*  In addition, the amounts listed in the statements for
Northern Star and Kohler, $16,225,000 and $4,760,000, were fictitious as no promotional
allowance program existed between these subsidiaries and USF.  *Id.* ¶ 16.  From those figures, it
appears that Daly's overstatements associated with less than ten percent of the aggregate amount
of USF's overstated allowances, although calculation of the precise amount is unnecessary for
purposes of deciding the instant motion.

Consent Judgment at 5.  As provided therein, the SEC filed the instant Motion for Final

Judgment of Monetary Relief on October 17, 2007, asking the Court to impose a maximum (so-

called "third-tier") penalty on Daly.  On November 19, 2007, Daly filed a *pro se* Opposition to

the SEC's Motion, arguing that the Court should not impose a penalty or should impose one that

is less than the statutory maximum.  *See* Def.'s Opp'n at 1-4.  The SEC did not file a Reply.

After reviewing the parties' briefs in connection with the instant Motion, it was apparent

that one of Daly's arguments for receiving a reduced penalty–that he was impecunious–was not

substantiated with any supporting materials.  Given Daly's *pro se* status, the Court issued an

Order allowing him the opportunity to supplement his Opposition with an affidavit and

supporting records setting forth his income, debts, assets, and any other pertinent information he

deemed appropriate, no later than July 3, 2008.  *See* Min. Order dated June 19, 2008.  Daly failed

to file any additional information.  The Court subsequently learned that the Clerk of the Court

may not have issued the Order to Daly because his address was not reflected on the docket.

Accordingly, out of an abundance of caution, the Court reissued its Order on July 10, 2008 after

the Clerk's office corrected the docket, allowing Daly the opportunity to provide the Court with

this information by July 24, 2008.  *See* Min. Order dated July 10, 2008.  Daly failed to respond to

that Order, as well.  Accordingly, the SEC's Motion is fully ripe for decision.

## II.  LEGAL STANDARD

The SEC asks the Court to impose civil penalties under Section 21(d)(3) of the Exchange

Act, 15 U.S.C. § 78u(d)(3). According to that provision, "the court shall have jurisdiction to

impose, upon a proper showing, a civil penalty, to be paid by the person who committed such

violation."  *Id.* § 78u(d)(3)(A).  Such penalties are divided into tiers, with the third tier reserved

4

for those cases in which the violation (1) "involved fraud deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* § 78u(d)(3)(B)(iii).  Each third tier penalty may not exceed the greater of $100,000 or the gross pecuniary gain to the defendant as a result of the violation.[3]  *Id.*  The amount of any penalty imposed is subject to the broad discretion of the court "in light of the facts and circumstances" of the case.  *Id.* § 78u(d)(3)(B)(i).

## III.  DISCUSSION

The SEC argues that imposition of a third-tier civil penalty is appropriate in this case because the facts deemed true for purposes of the instant Motion establish the two elements necessary to assess a third-tier penalty: (1) conduct involving "fraud, deceit, manipulation" that (2) "directly or indirectly resulted in substantial losses or created the risk of substantial losses" to Ahold's shareholders.  Pl.'s Mot. at 5 (quoting 15 U.S.C. § 78u(d)(3)(B)(iii)).  Although Daly suggests otherwise, the Court agrees that the statutory requirements for a third-tier violation have clearly been met in this case.

As for the first element, Daly does not deny his fraudulent conduct.  *See* Def.'s Opp'n ¶ 5 ("I have admitted providing four promotional allowance letters that were not accurate to UFS executives who in turn used that information inappropriately").  Nor could Daly argue otherwise. The facts of the Complaint, deemed true for purposes of this Motion, establish that he "knowingly" provided false information to independent auditors concerning overstated

---

[3] The amount of the maximum penalty was increased in 2007 to $120,000 for individuals, but only for violations occurring after February 14, 2005.  *See* 17 C.F.R § 201.1003 (2007).  The SEC does not contend that Daly's conduct occurred after that date.

promotional allowances paid to USF.  Compl. ¶¶ 14, 16, 19.  As for the second element, Ahold's

stock price fell significantly as a result of the scheme to overstate USF's promotional allowances

by approximately $700 million – a scheme that Daly substantially assisted.  *Id.* ¶ 6, 14.  Although

Daly argues that the SEC has failed to quantify the amount of loss associated with his conduct,

*see* Def.'s Opp'n at 3 (arguing that the SEC failed to show that "any person or entity suffered any

financial damages or loss as a direct result of any document [he] signed or anything [he] did"),

*id.* (arguing that the SEC has "made no attempt or made any effort to determine the precise

financial impact of [his] actions upon anyone or whether [his] actions were the cause for the fall

in the stock price of Ahold's stock"), the applicable statute contains no such requirement.

Instead, the SEC must show that Daly's conduct "directly or indirectly" led to a "risk" of

substantial losses.  15 U.S.C. § 78u(d)(3)(B)(iii).  Here, Daly signed confirmation letters

knowing that they contained false information, Comp. ¶¶ 14, 16, 19, and that overstated the

amount of promotional allowances by tens of millions of dollars over a two-year period.  *Id.* ¶¶

15, 18.  This conduct not only created a risk of substantial losses, but it did, in fact, facilitate a

scheme that resulted in substantial losses.  *See SEC v. Koenig*, 532 F. Supp. 2d 987, 990 (N.D.

Ill. 2007) ("shareholder loss is more than sufficient to establish substantial harm").  Courts in this

and other districts have routinely found that this type of fraudulent conduct warrants imposition

of third-tier penalties.  *See, e.g.*, *SEC v. Levine*, 517 F. Supp. 2d 121, 141-43 (D.D.C. 2007)

(finding third-tier penalties appropriate where defendants filed multiple fraudulent reports with

the SEC); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998) (CKK) (imposing

third-tier penalties where defendants solicited investors for a trading program that had not been

thoroughly investigated); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421-22, 426 (D. Md. 2005)

(imposing a third-tier penalty where defendant materially misstated his company's financial condition and disseminated false account statements). On these facts, the Court concludes that both elements for imposition of a third-tier penalty have been met.[4]

The Court may impose up to $100,000 for a third-tier violation of the Act.  15 U.S.C. § 78u(d)(3)(B)(iii).  The Court has parsed Daly's *pro se* Opposition to the SEC's Motion and can discern three arguments raised by Daly as to why the Court should impose a penalty less than the statutory maximum:  (1) Daly is not in a position where he can violate the Exchange Act in the future, (2 ) he has already plead guilty in a related criminal proceeding, and (3) he is impecunious.  Def.'s Opp'n at 2-4.  None of these arguments is meritorious.

First, Daly's argument that "there is no possibility whatsoever that these actions will ever be repeated," *id.* at 1, is not a reason to impose a lesser penalty in this case.  Congress added the civil penalty provision of the Exchange Act in 1990 "to achieve the dual goals of punishment of the individual violator and deterrence of future violations."  *SEC v. Moran*, 944 F.Supp. 286, 296 (S.D.N.Y. 1996)); *see* H.R. Rep. No. 101-616, at 15 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1379, 1384 ("[A]uthority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator").  While Daly may never again be in a position to violate the Exchange Act, a fact the Court would have to believe based solely on the unsworn argument presented in Daly's Opposition, imposition of civil penalties in this case serves to punish Daly for his conduct and may deter *other* individuals.  *SEC v. Koenig*, 532 F.

---

[4] The Court notes that Daly's protestations that the SEC failed to quantify the amount of loss attributable to his conduct are undermined by his own admission that the actual amount is "unknowable."  Def.'s Opp'n at 3.

Supp. 2d 987, 996 (N.D. Ill. 2007) (imposing a civil penalty that "is appropriate and serves as an ample punishment for [the defendant] and a deterrent to like-minded individuals"). Second, Daly's argument that the Court should reduce the amount of the penalty in this case because he has already been convicted in a related criminal proceeding, Def.'s Opp'n at 1, is unavailing. The statute provides that civil penalties may be sought "in addition to any other action that the Commission or the Attorney General is entitled to bring," 15 U.S.C. § 78u(d)(3)(C)(iii). Moreover, Daly does not specify what monetary penalty or prison sentence, if any, was imposed in his criminal case, and his bare assertion that the "cost of that indictment and conviction and sentence is incalculable," *id.* at 2, provides an insufficient basis for the Court's consideration. Third, Daly's argument that the Court should reduce the amount of the penalty because he is impecunious must fail. The Court issued *two* Orders allowing Daly to substantiate this argument, *see* Min. Order dated June 19, 2008; Min. Order dated July 10, 2008, and he failed to do so.

The sole remaining question is the precise amount of the penalty the Court shall impose. The Court has wide discretion to determine the amount of the penalty. *See* 15 U.S.C. § 78u(d)(3)(B)(i) ("[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances"); *Moran*, 944 F. Supp. at 296-97 ("Considering the discretionary nature of the civil penalty framework, prior decisions and consent decrees are of little comparative value for any individual matter. Each case, of course, has its own particular facts and circumstances which determine the appropriate penalty to be imposed."). The Court recognizes that one commonly used benchmark to determine the amount of the penalty–the amount of the defendant's pecuniary gain–is not appropriate in this case because the SEC did not allege that Daly gained personally from his fraudulent conduct. *Cf. Levine*, 517 F. Supp. 2d at 141-42

(imposing a penalty of $200,000 in order to approximate the gross pecuniary gain); *Koenig*, 532

F. Supp. 2d at 995-96 (imposing a penalty equal to the pecuniary gain instead of the maximum

amount permissible).[5]   The SEC did not file a Reply disputing Daly's argument that he did not, in

fact, gain anything as a result of this scheme.   Nevertheless, Daly has admitted to sending four

fraudulent letters that contributed to a massive restatement of USF's net and operating income

and substantial losses to shareholders.   In the absence of any meritorious reason as to why Daly

should not receive the full amount of a third-tier penalty, the Court shall exercise its discretion

and impose a single third-tier penalty of $100,000.[6]

## IV.  CONCLUSION

For the reasons set forth above, the Court shall GRANT the SEC's [14] Motion for Final

Judgment of Monetary Relief.   The Court shall impose a third-tier penalty on Defendant Daly in

the amount of $100,000.   An appropriate Order accompanies this Memorandum Opinion.


Date:    August 25, 2008


                              /s/
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge

---

[5] Although it is not entirely clear from Daly's *pro se* submission, Daly may have intended to argue that the amount of pecuniary gain "caps" the amount a Court may impose as a penalty. To the extent Daly intended to make that argument, it must be rejected.   The unambiguous language of the statute states that the Court may award *the greater of* $100,000 or the gross pecuniary gain to the defendant as a result of a violation.   15 U.S.C. § 78u(d)(3)(B)(iii).

[6] The Court recognizes that Daly has admitted to sending four fraudulent letters, suggesting that the Court could impose multiple third-tier penalties.   Given that these letters all involved the same conduct and the same scheme, and given that Daly does not appear to have gained anything as a result of his conduct, the Court is convinced that the assessment of one third-tier penalty is sufficient to meet the twin purposes of punishment and deterrence in this case.